IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
WILLIAMSPORT DIVISION

| | | |
|---|---|---|
| ALEX GOLDOVSKY, GLYNN FRECHETTE, JOHN KRUPEY, and KRISTIN SCHARF, Individually and on Behalf of All Others Similarly Situated, *Plaintiffs*, | § § § § § § | CIVIL NO. 4:25-CV-00923<br><br>COMPLAINT-CLASS ACTION |
| v. | § § § | JURY |
| CITIZENS & NORTHERN BANK, *Defendant*. | § § | |

**ORIGINAL CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................ 1

II. PARTIES AND RELEVANT NON-PARTIES .............................................. 5

A. Plaintiffs ........................................................................................... 5

B. Defendant ........................................................................................ 4

C. Relevant Non-Parties ....................................................................... 6

1. The *SEC v. Hill* Defendants ...…………………………………….... 6

2. The FIC Texas Partnerships………………………..………………… 7

3. The Texas Class Action Defendants ..…………………………………… 8

III. JURISDICTION AND VENUE ................................................................. 9

IV. FACTS ………………………………………………………………………..10

A. The Carbon Capture Ponzi Scheme ……………………………..……... 10

1. The Carbon Capture Technology Promoted by the
*SEC v. Hill* Defendants ……………………………...………………...10

2. The FIC Texas Partnerships….……………………………………..…… 11

3. The Partnerships Paid Investors from Other Investor
Funds, Not from Carbon Capture Revenues……………………………..12

4. C&N Bank Provided Banking Services Essential to the Ponzi Scheme …15

B. The Primary Violations of the Texas Securities Act by the
*SEC v. Hill* Defendants and the FIC Texas Partnerships …..……………..16

1. Sales of Unregistered Securities ………………………………………16

2. Sales of Securities by Means of Untruth or Omission …………………...18

a. Misrepresentations and Omissions that Carbon Capture Units Existed and Were Operating……………………...……..19

b. Misrepresentations and Omissions that Investor Funds Would Be Used to Build and Deploy CCUs ………..…………………21

c. Misrepresentations and Omissions in the Business Plans that Revenues from Leasing the CCUs Would Fund Distributions to Investors ……………………………………….…...24

d. Tax Benefit Representations and Omissions ………………………..28

e. Misrepresentations and Omissions in the Quarterly Reports and "Fund Scorecards" …………………………………..32

C. C&N Bank's Involvement in the Ponzi Scheme …………………………..33

1. C&N Bank Is Required by Federal Law to Know its Customers and their Banking Behavior ………………………………..…34

2. C&N Bank Was Aware that Shelly, FIC and the FIC Texas Partnerships Were Selling Unregistered Securities ……………………..37

3. C&N Bank Was Aware that Shelly, FIC and the FIC Texas Partnerships Were Part of a Ponzi Scheme ……………………………..38

a. C&N Bank Was Aware of the Pattern of the Creation of the FIC Texas Partnerships ……………………………………..38

b. C&N Bank Knew that the Pattern of Deposits and Withdrawals in the FIC Texas Partnerships' Accounts Showed No Ordinary Business Activity and Only the Funding of Quarterly Payments to Investors …………………..40

c. C&N Bank Saw the Repetitive Pattern of Distributions to Investors ……………………………………………………………43

VI. CLASS ACTION ALLEGATIONS (LR 23.2)……………………………46

"(1) The size (or approximate size) and definition of the alleged class"..…….46

"(2) The basis upon which the plaintiffs claim (A) To be adequate representatives of the class"……………………………...……48

"(3) The alleged questions of law and fact claimed to be common to the class"..……………………………………………………50

"(4) In actions claimed to be maintainable as class actions under subdivision (b)(3) of Fed.R.Civ.P.23, allegations thought to support the finding required by that subdivision" ……………………..…50

VII. CAUSES OF ACTION …………………………………….………..51

COUNT I Violation of § 4008.051 and § 4008.055(c) of the Texas Government Code …………..……………….………..…51

COUNT II Violation of § 4008.052 and § 4008.055(c) of the Texas Government Code ………………………………………52

Remedies for Violations of the Texas Securities Act in Counts I and II…………………………………………...53

VIII. PRAYER FOR RELIEF…………………………………………………53

IX. DEMAND FOR JURY TRIAL ………………………………………………54

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
WILLIAMSPORT DIVISION

| | | |
|---|---|---|
| ALEX GOLDOVSKY, GLYNN FRECHETTE, JOHN KRUPEY, and KRISTIN SCHARF, Individually and on Behalf of All Others Similarly Situated, *Plaintiffs*, | § § § § § § | CIVIL NO. ___________________ <br><br> COMPLAINT-CLASS ACTION |
| v. | § § § | JURY |
| CITIZENS & NORTHERN BANK, *Defendant*. | § § | |

**ORIGINAL CLASS ACTION COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Alex Goldovsky, Glynn Frechette, John Krupey, and Kristin Scharf, Plaintiffs, file this Original Class Action Complaint against Citizens & Northern Bank, and state and allege as follows:

## I. INTRODUCTION

1. This is a class action under Texas law to recover damages suffered by the Plaintiffs and all persons similarly situated who invested in a fraudulent Ponzi scheme, "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors." *See Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 662, n. 3 (Tex. 2016).

2. Plaintiffs invested in Texas limited partnerships that were actually part of a Ponzi scheme. Plaintiffs discovered the fraudulent Ponzi scheme after the United States Securities and Exchange Commission ("SEC") filed suit on May 3, 2023 to stop two individual defendants and their two companies from soliciting investors in their Ponzi scheme. The SEC's lawsuit is styled *SEC v. Roy W. Hill, et al.*, and is pending as Civil Action No. 6:23-cv-00321-ADA in the United States District Court for the Western District of Texas, Waco Division. It will be referred to in this Complaint as "*SEC v. Hill*." The defendants in *SEC v. Hill* are Roy W. Hill, his company Clean Energy Technology Association, Inc. ("CETA"), Eric N. Shelly, and his company Freedom Impact Consulting, LLC ("FIC").

3. The *SEC v. Hill* Defendants defrauded the investors in the Ponzi scheme by selling unregistered securities from, by and through Texas, in transactions that emanated from Texas. These unregistered securities included interests in partnerships that Shelly and FIC organized under Texas law. Shelly, FIC and Hill also sold these unregistered partnership interests by making untrue statements to the investors about them, and by omissions that made their statements misleading. The *SEC v. Hill* Defendants thereby committed primary violations of the Texas Securities Act, Title 12 of the Texas Government Code (hereinafter, the "TSA"). Plaintiffs do not assert any claims under federal law.

4. In *SEC v. Hill*, the district court appointed a receiver over Hill, CETA, Shelly and FIC and enjoined and stayed any other legal proceedings against them or their businesses. (ECF No. 8, pp. 10-12, ¶¶ 29-34). Plaintiffs therefore do not sue those defendants in this case. Under Texas law, primary TSA violators do not have to be parties to an aiding and abetting lawsuit. *Highland Cap. Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 740 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

5. During the more than three years that Shelly and FIC ran their part of the Ponzi scheme through these Texas limited partnerships, Citizens & Northern Bank ("C&N Bank") opened and operated bank accounts for each partnership. C&N Bank accepted wire transfers of investor funds, wired the same funds to CETA in Texas, received funds back from CETA, and transferred those funds to FIC to pay investors the promised returns. Plaintiffs bring this action against C&N Bank because its banking services to the the Shelly and FIC partnerships made the Ponzi scheme possible. C&N Bank is liable under the TSA for materially aiding primary violations of the TSA by Shelly, FIC and Hill.

6. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all others. Plaintiffs' information and belief are based on the independent investigation of their undersigned counsel, conducted under Plaintiffs' supervision and at Plaintiffs' expense. This investigation includes, but is not limited to, (a) review and analysis of

public records, or the lack of public records, at such agencies as the SEC, the Texas Secretary of State, and the Texas Securities Board; (b) reviewed and analyzed documents prepared and distributed by the *SEC v. Hill* Defendants and other relevant non-parties including contracts, business plans, schedules, budgets and “pro formas”; (c) recorded, transcribed or summarized conferences, webinars and podcasts involving the *SEC v. Hill* Defendants and other relevant non-parties; (d) emails and other communications of the *SEC v. Hill* Defendants and other relevant non-parties; (e) consultation with industry and financial experts; (f) pleadings, filings, evidence and court orders in the *SEC v. Hill* action, the fact that the SEC’s action is based on a thorough investigation by the SEC and FBI, and the fact that the Court entered judgments against Roy W. Hill and Eric N. Shelly on the facts pleaded by the SEC in that action; (g) pleadings, filings, evidence and court orders in other litigation involving defendants or involving the CETA-FIC Ponzi scheme, and (h) pleadings, filings, evidence and discovery in a related action filed by Plaintiffs, *Goldovsky, et al. v. Rauld, et al.*, No. 6:24-CVC-00159-ADA-DTG, in the United States District Court for the Western District of Texas, Waco Division.[1]

[1] C&N Bank was originally named as a defendant in *Goldovsky, et al. v. Rauld, et al.*, but was dismissed on C&N’s Rule 12(b)(2) motion for lack of personal jurisdiction. (ECF No. 100, Mar. 27, 2025). Rather than appeal that ruling, Plaintiffs bring this lawsuit against C&N Bank in this District, as C&N Bank is organized under Pennsylvania law and maintains its principal place of business in this District.

Plaintiffs' independent investigation and litigation has been conducted over a two-year period and has been reasonable under the circumstances.

7. The following factual allegations have evidentiary support based on Plaintiffs' independent investigation described in the preceding paragraph, or will likely have evidentiary support after a reasonable opportunity for further investigation and discovery of information that is within the control of defendants, relevant non-parties and others.

## II. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiffs

8. Plaintiff Alex Goldovsky ("Goldovsky") is an individual who resides in and is a citizen of Pennsylvania. Goldovsky invested $1,300,000.00, as follows:

$500,000.00 in SYN 09, LP on or about April 28, 2022;
$300,000.00 in CC5 Shares 2022, LP on or about August 31, 2022, and
$500,000.00 in CC6 Shares 2022, LP on or about February 21, 2023.

9. Plaintiff Glynn Frechette ("Frechette") is an individual who resides in and is a citizen of Colorado. Frechette invested $200,000.00, as follows:

$100,000.00 in OShares 04, LP on or about September 2, 2022, and
$100,000.00 in OShares 05, LP on or about April 20, 2023.

10. Plaintiff John Krupey ("Krupey") is an individual who resides in and is a citizen of Puerto Rico. Krupey invested $100,000.00 in OShares 04, LP on or about October 11, 2022.

11. Plaintiff Kristin Scharf ("Scharf ") is an individual who resides in and is a citizen of Colorado. Scharf invested $200,000.00, as follows:

$100,000.00 in OShares 04, LP on or about September 23, 2022, and
$100,000.00 in OShares 05, LP on or about March 27, 2023.

12. Goldovsky, Frechette, Krupey and Scharf will be referred to collectively as "Plaintiffs."

**B. Defendant**

13. Defendant Citizens & Northern Bank ("C&N Bank") is a financial institution organized and existing under the laws of the State of Pennsylvania, has its principal place of business in Wellsboro, Pennsylvania, and is a citizen of Pennsylvania.

**C. Relevant Non-Parties**

14. This action is against C&N Bank, for materially aiding violations of the Texas Securities Act. Plaintiffs will describe non-parties who are relevant to Plaintiffs' claims against C&N Bank, either as primary violators of the TSA or as defendants in the Texas Clas Action.

**1. The *SEC v. Hill* Defendants**

15. As described above, Plaintiffs allege that C&N Bank materially aided primary violations of the Texas Securities Act by the following four defendants in *SEC v. Hill*:

a. Roy W. Hill ("Hill") is a resident of Fairfield, Texas. Hill agreed to the entry of a judgment in *SEC v. Hill* admitting the SEC's allegations. ECF Nos. 37, 40.

b. Clean Energy Technology Association, Inc. ("CETA") is a Texas corporation located in Fairfield, Texas. Hill founded and controlled CETA .

c. Eric N. Shelly ("Shelly") resided in Ocala, Florida and West Chester, Pennsylvania at the time the SEC filed suit. Shelly agreed to the entry of a judgment in *SEC v. Hill* admitting the SEC's allegations. ECF Nos. 38, 41.

d. Freedom Impact Consulting, LLC ("FIC") is a Pennsylvania corporation with its principal place of business in West Chester, Pennsylvania. Shelly founded, owned, and controlled FIC.

**2. The FIC Texas Partnerships**

16. FIC sponsored over 60 limited partnerships that were used to attract investor funds for the Ponzi scheme. FIC created 63 of these partnerships by filing a certificate of formation for each with the Texas Secretary of State. These 63 partnerships are listed on Exhibit 1 to this Complaint, which is incorporated herein by reference. These 63 partnerships will be referred to at times in this Complaint as the "FIC Texas Partnerships." The principal office of each of the 63 Texas FIC Partnerships is at 5900 Balcones Drive, Suite 100, in Austin, Texas. Each certificate of formation for these Texas partnerships named FIC as the general partner. The

existence of a Texas limited partnership commences when the certificate of formation takes effect. Tex. Bus. Org. Code § 3.001(c).

17. FIC also formed three partnerships by filing certificates of formation with the Wyoming Secretary of State. FIC was the general partner of each Wyoming partnership. Texas law requires that a limited partnership from another state must register with the Texas Secretary of State to transact business in Texas. Tex. Bus. Org. Code § 9.001. Each of the Wyoming partnerships registered as a foreign limited partnership with the Texas Secretary of State, naming FIC as its governing person and stating that its registered agent's address and its registered office address was 5900 Balcones Drive, Suite 100, in Austin, Texas. [2]

**3. The Texas Class Action Defendants.**

18. As described in note 1 above, Plaintiffs have filed and are prosecuting a related action, *Goldovsky, et al. v. Rauld, et al.*, No. 6:24-CVC-00159-ADA-DTG, in the United States District Court for the Western District of Texas, Waco Division ("the Texas Class Action"). The defendants in the Texas Class Action are:

a. Mauricio J. Rauld, a lawyer in San Clemente, California. Rauld was a member of the Freedom Impact Consulting "Advisory Team."

---

[2] The Wyoming partnerships and all 63 of the FIC Texas Partnerships are described in this Complaint because they were all used by Shelly and FIC in their part of the Ponzi scheme. Based on records produced by Shelly, FIC and C&N Bank to the SEC, all investors in the three Wyoming Partnerships and some of the FIC Texas Partnerships received funds from the Ponzi scheme in excess of their investments. Because such investors did not suffer a net loss, they are not included in the class alleged below.

b. Premier Law Group is Mauricio Rauld's law firm with its office in San Clemente, California.

c. Timothy B. Gertz ("Gertz") is an accountant in Phoenix, Arizona. Gertz was a member of the Freedom Impact Consulting "Advisory Team."

d. PV Advisors, PLC is Gertz's accounting firm. It does business under the assumed names "ProVision" and "ProVision Wealth Strategist" and has its office in Phoenix, Arizona.

e. Wells Fargo Bank, N.A., is a national bank with its principal place of business in San Francisco, California. Wells Fargo provided banking services to Hill, CETA, and related companies and trusts that made the Hill and CETA part of the Ponzi scheme possible.

## III. JURISDICTION AND VENUE

19. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)(2)).

20. At least one member of the proposed class is a citizen of a different state from any defendant. In particular, Plaintiffs Frechette, Krupey and Scharf are citizens of states different from Defendant C&N Bank. *See* Paragraphs 9-11 and 13, above.

21. There are more than 500 members of the proposed class.

22. The aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

23. This Court has general personal jurisdiction over Defendant C&N Bank because C&N Bank is a financial institution organized and existing under the laws of the State of Pennsylvania, has its principal place of business in Wellsboro, Pennsylvania, is a citizen of Pennsylvania, and is "at home" in Pennsylvania.

24. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant C&N Bank resides in this District.

## V. FACTS

### A. The Carbon Capture Ponzi Scheme.

25. The CETA-FIC Ponzi scheme was based on a supposedly new technology developed by CETA that combined removal and underground storage of carbon dioxide with enhanced oil and gas production. The technology was a fraud: it produced no revenues, and the returns paid to investors were actually funded with investors' money.

#### 1. The Carbon Capture Technology Promoted by the *SEC v. Hill* Defendants.

26. Hill and CETA claimed that CETA's mobile carbon capture units ("CCUs") used a proprietary solvent to remove carbon dioxide ("$CO_2$") from natural gas. They offered types of CCUs, the "$CO_2$ *TRANSMISSION* Pipeline" and the "$CO_2$ *NOMAD*."





$CO_2$ *TRANSMISSION* Pipeline $CO_2$ *NOMAD*

CETA originally priced the "$CO_2$ *TRANSMISSION* Pipeline" units at $1,500,000.00, later raising the price to $1,650,000.00. CETA originally charged $1,040,000.00 for the smaller "$CO_2$ *NOMAD*" units, later raising the price to $1,060,000.00.

27. Hill and CETA claimed that their CCUs allowed gas producers to (a) process gas at the well to be ready for market without going to a separate processing site; (b) inject the $CO_2$-infused solvent back into the well to enhance recovery of oil and gas, and (c) sequester the $CO_2$ underground to reduce climate change.

**2. The FIC Texas Partnerships.**

28. CETA sold some CCUs to investors as part of a set of agreements in which Hill and CETA claimed that gas producers would lease the CCUs in exchange for a share of the revenues from their enhanced production. Some investors bought CCUs directly from CETA. The high cost of a single CCU made investing unattractive or not possible for many investors. Hill and CETA teamed with Shelly and FIC to sell interests in limited partnerships for fractions of the cost of individual

CCUs, allowing investors to invest smaller amounts and pool their funds. The partnerships created by Shelly and FIC would supposedly purchase and operate CETA CCUs. This partnership model vastly expanded the number of potential investors.

29. Shelly and FIC began by creating Freedom Energy Fund, LP, a Texas limited partnership, on December 10, 2019. They formed another Texas limited partnership, Freedom Energy Fund 2, LP, on February 11, 2020. Shelly and FIC then created three Wyoming limited partnerships on August 24, 2020. Shelly and FIC then began to register Texas limited partnerships in batches. They created 61 additional Texas limited partnerships between October 27, 2020, and another partnership on November 30, 2020 and February 7, 2023. These FIC Texas Partnerships are summarized on Exhibit 1 to this Complaint.

**3. The Partnerships Paid Investors from Other Investor Funds, Not from Carbon Capture Revenues.**

30. The *SEC v. Hill* Defendants were running a Ponzi scheme. The SEC alleged that the *SEC v. Hill* Defendants operated their scheme from 2019 to 2023. The following factual allegations in the *SEC v. Hill* complaint confirm the existence of the Ponzi scheme:

a. "CETA has not built the CCUs beyond a few prototypes to show prospective investors, or leased the CCUs to any major oil and gas producers. … And bank records reveal that some investor distributions to date have been sourced from the money received from new or existing investors. Most critically, CETA has not

generated revenues from any CCU operations, as represented to investors. Instead, CETA and Hill have used investor funds to pay quarterly "returns" to investors ,…" ECF 1, ¶ 3.

b. "…Shelly then transfers all or nearly all investor money from the Funds' accounts into other accounts held at Wells Fargo Bank in the name of 'Roy Hill Trust' ('Hill Trust Accounts')." ECF 1, ¶ 29.

c. "Once investor funds are transferred to the Hill Trust Accounts, CETA and Hill have not used the money to purchase and deploy CCUs or to obtain working interests in oil and gas fields, as they represented. Rather, CETA and Hill have used investor funds to, among other things, pay quarterly "returns" to investors, cover CETA's payroll expenses, make transfers to other accounts controlled by the Defendants, and pay personal expenses." ECF 1, ¶ 30

d. "Most critically, the bank records reflect that CETA and Hill have not generated revenue from business operations. Rather, the vast majority of money flowing into CETA's and Hill's accounts comes from transfers of investor funds from the Funds' bank accounts." ECF 1, ¶ 31.

31. The district court in *SEC v. Hill* has entered judgment against Hill and Shelly based on the facts stated in the SEC's complaint. These judgments confirm the existence of the Ponzi scheme. The only CCUs sold by CETA were non-working prototypes. The FIC Texas Partnerships supposedly owned and operated CCUs that did not actually exist. CETA did not lease CCUs to oil and gas producers and had no revenues from them. Investors in the FIC Texas Partnerships were not paid from any business revenues; instead, earlier investors were were paid out of funds raised from by later investors.

32. On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further investigation and discovery, Plaintiffs adopt the foregoing allegations of the *SEC v. Hill* complaint as additional confirmation that the *SEC v. Hill* Defendants operated a Ponzi scheme.

33. To attract the later investors whose funds kept the scheme going, the *SEC v. Hill* Defendants had to show that earlier investors actually received the promised returns. Shelly, FIC, Hill and the FIC Texas Partnerships did this in several ways.

- They expressly referred to the performance of earlier partnerships to sell interests in later partnerships.

- They knew that paying promised quarterly returns to investors in one partnership would encourage those investors to invest in additional later partnerships, and in fact many investors invested in a series of the FIC Texas partnerships because they received the promised returns from earlier partnership investments.

- They also knew that investors who were receiving the promised quarterly returns would tell other potential investors about their experience, and in fact many later investors either learned about the FIC Texas Partnerships from earlier investors, or were invited by Shelly, FIC and their promoters and syndicators to talk to prior investors about the actual quarterly payments they were receiving.

The CETA-FIC Ponzi scheme needed to show new investors that earlier investors had received the promised returns. The Ponzi scheme needed new investors' funds

to keep the scheme going. The FIC Texas Partnerships had to appear legitimate to continue operating and not risk exposing the scheme.

**4. C&N Bank Provided Banking Services Essential to the Ponzi Scheme.**

34. Shuffling all of these investor funds back and forth among the partnerships, CETA and FIC required bank accounts. During the more than three-year existence of the Ponzi scheme, C&N Bank opened bank accounts for each of the 63 FIC Texas Partnerships. Investor funds only went into the Ponzi scheme by means of wire transfers through these C&N Bank accounts. The *SEC v. Hill* Defendants used the C&N Bank accounts to move hundreds of millions of dollars back and forth in their Ponzi scheme:

- Investors sent more than 690 wire transfers to C&N Bank to deposit over $130 million into the FIC Texas Partnership accounts;

- C&N Bank sent more than 200 wire transfers from the FIC Texas Partnership bank accounts totaling over $130 million in investor funds to the “Roy W. Hill Trust 21” in Texas, with “special instructions” that the funds were for the purchase of carbon capture equipment; and

- C&N Bank received over 100 wire transfers from CETA in Fairfield, Texas to make the promised distributions to investors.

By opening accounts for each of the FIC Texas Partnerships and processing the flows of money into and out of the accounts, C&N Bank materially aided the Ponzi scheme by making these money flows appear legitimate.

35. As Plaintiffs will show in more detail in Paragraphs 87-113 below, from the time it opened the first accounts for the FIC Texas Partnerships, C&N Bank knew that Shelly and FIC were offering and selling unregistered securities. C&N Bank also saw that Shelly and FIC were creating batches of new partnerships every quarter, and that the activity in the partnership bank accounts showed no business revenues or expenses. The only activity in the accounts occurred at the end of each quarter, when CETA sent funds to each account and when each partnership would move the same funds to FIC so that it could make the promised quarterly payments to the investors.

**B. The Primary Violations of the Texas Securities Act by the *SEC v. Hill* Defendants and the FIC Texas Partnerships.**

**1. Sales of Unregistered Securities.**

36. The Texas Securities Act requires that securities must be registered for sale. An issuer must either obtain a permit from the Texas Securities Commissioner qualifying the securities for sale, Tex. Gov't Code § 4003.001(a), or have certain alternate forms of registration. Tex. Gov't Code § 4003.051, § 4003.101. A person who offers or sells an unregistered security in violation of this requirement is liable to the buyer of the security. Tex. Gov't Code § 4008.051(a). The Texas Supreme Court holds that these TSA provisions further Texas's strong interest in regulating the sale of securities in and from the state. Compensating investors victimized by violations of the TSA "encourages compliance with Texas's regulatory and

disclosure provisions, creates an incentive for its private enforcement, and guards the integrity of the state's securities industry by protecting resident sellers who operate in compliance with the law." *Citizens Ins. Co. v. Daccach*, 217 S.W.3d 430, 440 (Tex. 2007).

37. Shelly, FIC and the Texas FIC Partnerships were each sellers of unregistered securities in the form of partnership interests in the Texas FIC Partnerships. Under the TSA, limited partnership interests are securities. Tex. Gov't Code § 4008.068(1)(A). In addition, Shelly, FIC and the Texas FIC Partnerships described the partnership interests as securities when they offered and sold them.

38. No person has applied to the Texas Securities Commissioner for a permit qualifying any of the FIC Texas Partnership interests for sale. The FIC Texas Partnership interests have not been registered by any alternate method. Plaintiffs have obtained from the the Texas State Securities Board certificates by the Texas Securities Commissioner confirming that none of the 63 FIC Texas Partnerships are registered. The TSA provides that such certificates are prima facie evidence of noncompliance with the Act. Tex. Gov't Code § 4001.154.

39. The SEC has alleged in its Complaint, and Hill and Shelly have admitted, that these unregistered partnership interests were promoted by means of public solicitation:

> "Shelly and Hill have actively promoted investments in the Funds through, among other means: (i) CETA and FIC websites; (ii) webinars

> hosted by Shelly; and (iii) quarterly and other periodic updates that Shelly, and in some cases, Hill, provides to investors." *SEC v. Hill*, ECF 1, ¶ 23.
>
> "On CETA's and FIC's websites, potential investors can access investment marketing materials, including but not limited to, private placement memoranda, Fund subscription documents, and wiring instructions. These documents are generally available to the public to download, without password protection or the need to request the materials." ECF 1, ¶ 24.
>
> "The webinars are available as videos on YouTube, where FIC maintains a channel. Several of these videos, which feature Shelly (and at times, Hill) speaking about the advantages of investing in the Funds and display marketing materials, have hundreds of views each. The periodic updates to investors contain information about CETA's performance, operations, and CCU deployment activity across multiple Funds, as well as information about FIC's ongoing fundraising activity." ECF 1, ¶ 25.
>
> "In addition to Hill's and Shelly's" direct marketing activities, investments in the Funds have been, and continue to be, promoted and sold by others. According to Shelly, at least six promotors have raised money from investors using their own websites." ECF 1, ¶ 26.

40. On Plaintiffs' information and belief, and based on evidentiary support that Plaintiffs reasonably believe they will develop after a reasonable opportunity for further investigation and discovery, Plaintiffs adopt the foregoing allegations of the *SEC v. Hill* complaint that the unregistered securities were promoted by means of public solicitation.

**2. Sales of Securities by Means of Untruth or Omission.**

41. In addition to selling unregistered securities, Shelly, FIC, Hill (as a member of FIC's "Advisory Team") and the FIC Texas Partnerships sold the

partnership interests by means of untruths and omissions. They misrepresented the interests sold to investors as a legitimate investment when they were actually a Ponzi scheme. Each of the FIC Texas Partnerships distributed a business plan. Most of their misrepresentations and omissions were in these business plans. When Shelly, FIC, Hill and their syndicators and promoters communicated directly with investors, they made the same misrepresentations and omissions that were in the business plans.

42. Shelly, FIC, Hill and the FIC Texas Partnerships offered and sold the partnership interests by means of the following untruths and omissions that previously established partnerships had purchased and placed CCUs, that proposed new partnerships would also purchase and place CCUs, that the CCUs were being leased, that the CCU leases were producing revenues, that the revenues were funding distributions to investors, and that business operations were creating tax benefits for the investors.

### a. Misrepresentations and Omissions that Carbon Capture Units Existed and Were Operating.

43. In their Business Plans, Shelly, FIC, Hill and the FIC Texas Partnerships stated that the CETA CCUs were an existing technology actually in use by oil and gas producers in Texas. A typical example is the "OShares 04, LP Business Plan" distributed to Plaintiffs Frechette, Krupey and Scharf in 2022.

44. The first page of the OShares 04, LP Business Plan described CCUs as actually in existence:

> “The Carbon Capture Units capture and on-site delivery for injection at any oil or gas delivery source is a more practical and economical way of accomplishing CO2 removal whenever needed. The Carbon Capture Units cost-effectively separates, captures, and delivers CO2 for direct use without the necessity of underground storage or expensive transportation.”

45. Under the heading “HOW CARBON CAPTURE UNITS WORK,” the OShares 04 Business Plan stated that “The Carbon Capture Units represent patented technology designed and developed by CETA.” In fact, the technology is not the subject of any patents.

46. In the same section, the OShares 04 Business Plan continued to describe the CCUs as in existence and in operating:

> “This is a disruptive new technology that is changing the way that natural gas is processed. This solvent will be utilized initially to capture CO2 out of pipelines to make the gas stream more marketable by capturing over 85 to 92.5% of the CO2. The CO2 is then absorbed into the solvent which the Company remains the owner. The Solvent with CO2 captured and absorbed is then reinjected into natural gas producer’s oil and gas wells to improve production in that same geographic area.”

47. The following paragraph was titled “High Demand,” and said:

> “Carbon Capture Units are a patented technology operated by CETA, which is in very high demand from oil and gas producers currently operating in the Permian Basin in Texas, as well as independent well owners, power plants, and the Department of Energy.”

48. In a box on the same page, the OShares 04 Business Plan falsely represented that FIC had placed 130 CCUs from 2019 through July 2022:

> "Freedom Impact Consulting placed the first two (2) Carbon Capture Units at the end of 2019, sixteen (16) in 2020, fifty-two (52) in 2021, and sixty (60) through July 2022."

The statement in the box concluded: "The market for portable equipment within the CO2 capture space is clearly present."

49. As detailed below, the OShares 04 Business Plan further represented that the CCUs were in existence and operating by claiming that the revenue projections were based on actual results from other CCU operations.

50. All of the statements by Shelly, FIC, Hill and the FIC Texas Partnerships in Paragraphs 41-49, above, were not true. Working CCUs did not exist, they were not patented, they were not in demand, and oil and gas producers were not using them in the Texas Permian Basin or anywhere else. By falsely stating that the CCUs were in existence and actually operating, Shelly, FIC, Hill and the FIC Texas Partnerships offered and sold limited partnership units that were actually a Ponzi scheme.

51. To be truthful, all of the statements from the OShares 04 Business Plan contained in Paragraphs 41-19, above, required the omitted facts that there were no working CCUs and that CCUs were not in operation anywhere. In light of the circumstances in which the Business Plan statements were made, these omissions were misleading.

### b. Misrepresentations and Omissions that Investor Funds Would Be Used to Build and Deploy CCUs.

52. In their Business Plans, Shelly, FIC, Hill and the FIC Texas Partnerships falsely stated that investor funds would be used to build and deploy CCUs.

53. The OShares 04 Business Plan began with this statement:

> "OShares 04, LP (OS 04) is a limited partnership created to own and operate a package of Mobile CO2TRANSMISSION Pipeline Units and CO2NOMAD Units as shown in the chart below (the "Carbon Capture Units"). These Carbon Capture Units will be leased to a natural gas producer to remove CO2 from gas streams at the wellsite and at the wellsite transmission pipelines. The use of this equipment on site at the well or the transmission pipeline will save the natural gas producer the cost of transporting gas for processing."

54. The "package" of CCUs to be acquired referenced in the preceding statement is in the OShares 04 Business Plan under the heading "EQUIPMENT PACKAGE AND CAPITAL FUNDING":

**Equipment Package for Carbon Capture Shares 2021 LP**

| Type of Unit | # of Units | Cost | total |
|---|---|---|---|
| $CO_2$*TRANSMISSION* Pipeline | Up to 10 | $1,650,000 | $16,500,000 |
| $CO_2$*NOMAD* | 0 | $1,160,000 | $0 |
| Totals | | | $16,500,000 |

The next page expressly stated that investor funds will be used to acquire this "package" under the heading "Revenue Share Tax Benefit": "On this project, OShares 04 investors will contribute 82.5 shares of $200,000 to acquire the package of equipment in the chart above for a total of $16,500,000."

55. The OShares 04 Business Plan then stated that, based on past and ongoing leasing of CCUs, new investor funds would finance the leasing and deployment of additional CCUs to natural gas producers, and that revenues from this leasing would generate returns for the investors. It stated that "Carbon Capture Units will be leased to a natural gas producer to remove CO2 from gas streams at the wellsite and at the wellsite transmission pipelines."

56. In the same section the OShares 04 Business Plan stated that the partnership

> "will hire and enter into an operating agreement with Clean Energy Technology Association Inc. ("CETA") to secure the leasing contracts with the natural gas producer, maintain the Carbon Capture Units, handle all operations of the Carbon Capture Units, including liaising with the producer on our behalf, handling all accounting, providing us with the CETASolve,™ and actually inject the CETASolve™ into the wells on behalf of [the partnership]."

57. All of the statements by Shelly, FIC, Hill and the FIC Texas Partnerships in Paragraphs 52-56, above, were not true. There was no basis in fact to claim that new investor funds would be used to manufacture and place CCUs under leases with natural gas producers. By falsely stating that investor funds were being used to manufacture and place CCUs when in fact they were used to pay earlier investor the promised returns, Shelly, FIC, Hill and the FIC Texas Partnerships offered and sold limited partnership units that were actually a Ponzi scheme.

58. To be truthful, all of the statements from the OShares 04 Business Plan contained in Paragraphs 52-56, above, required the omitted facts that investor funds would not be used to purchase and deploy CCUs. In light of the circumstances in which the Business Plan statements were made, these omissions were misleading.

**c. Misrepresentations and Omissions in the Business Plans that Revenues from Leasing the CCUs Would Fund Distributions to Investors.**

59. The OShares 04 Business Plan made numerous detailed statements about the revenues that leasing the CCUs would produce and how these revenues would fund distributions to the investors.

60. Under the heading "ENHANCED OIL RECOVERY," the OShares 04 Business Plan falsely stated that the CCUs increased the gas producers' revenues and "the Company shares in the revenues of every additional barrel of oil and natural gas produced by the well."

61. Under the heading "PARTNERSHIP," the OShares 04 Business Plan stated that the partnership would enter an operating agreement with CETA to lease and operate the CCUs.

> "In return [the partnership] will get a percentage of owned production from the injected wells that they are to be paid a flat amount per barrel based on this economic model.
>
> All revenue shall flow through CETA, who will take its share of the profits via a Management Fee from the revenues and provide OS 04 with its profit share.

> [The partnership] will receive revenue from the CETA operating agreement that assigns to us the lease agreement with natural gas producer for the CO2removal from gas streams and the enhanced oil recovery. The lease revenue we receive is not a flat fee, but rather a percentage of additional oil and gas revenue generated by the natural gas producers using our saturated solvent for enhanced oil and gas recovery (EOR). The baseline minimum revenue is calculated based on the volume of solvent used to absorb CO2 from the gas stream and is paid quarterly. Every six months the actual amount of enhanced gas and oil production is tallied and the actual percentage above the baseline is paid to us."

62. Under the heading "EQUIPMENT PACKAGE AND CAPITAL FUNDING," the OShares 04 Business Plan included a section titled "Operator Contract and Revenue":

> "As mentioned above, in addition to purchasing the equipment, OS 04 will enter into an operating contract with CETA to manage the various processes involved in this project. This contract will be the source of revenue for OS 04. CETA will earn revenue through the operation of the processes outlined below. The revenue will be shared with OS 04 with the following splits."

63. The referenced "splits" are in a chart headed "Waterfall Revenue Split Chart":

> "OS 04–65% / CETA–35% until OS 04 receives 1.5X of the original investment in revenue
> OS 04–50% / CETA–50% until OS 04 receives 2.0X of the original investment in revenue
> OS 04–35% / CETA–65% for the remaining life of the equipment."

64. Next, in a section titled "Revenue Share Tax Benefit," the OShares 04 Business Plan stated:

> “The revenue will be treated as follows. After receiving the revenue from CETA based on the waterfall split chart above, the revenue will be split 75% for the 82.5 investor shares and 25% to the manager. Please refer to the proforma below for the amounts projected for each investor and the manager.”

65. The referenced “proforma” is at the bottom of the same page:

> **“The following Proforma estimates 7 years of revenue**.

| Package Nomad/transmission | 1 | 2 | 3 | 4 | 5 | 6 | 7 | yrs 8-14 | 15 | |
|---|---|---|---|---|---|---|---|---|---|---|
| tot. lease and full rev. 1 co2 units | 11,700,000 | 11,700,000 | 9,311,540 | 6,386,540 | 6,300,000 | 6,300,000 | 6,300,000 | " " | 6,300,000 | $108,298,080 |
| revenue investors 75% | 8,775,000 | 8,775,000 | 6,983,655 | 4,789,905 | 4,725,000 | 4,725,000 | 4,725,000 | " " | 4,725,000 | $81,298,560 |
| investor 1 200K 30.55 shares | 106,364 | 106,364 | 84,660 | 58,068 | 57,273 | 57,273 | 57,273 | " " | 57,273 | $985,437 |
| 1/2 share investor | 53,182 | 53,182 | 42,325 | 29,030 | 28,636 | 28,636 | 28,636 | " " | 28,636 | $492,719 |
| Freedom Impact consulting 25% | 2,925,000 | 2,925,000 | 2,327,885 | 1,596,635 | 1,575,000 | 1,575,000 | 1,575,000 | " " | 1,575,000 | $27,099,520 |
| investor coc return | 53.18% | 53.18% | 42.33% | 29.03% | 28.64% | 28.64% | 28.64% | " " | 28.64% | |
| avg annual return | 32.85% | | | | | | | | | |

66. The OShares 04 Business Plan then explained that the Proforma was based on actual results from other CCU operations:

> “The projected net income line is based on the revenues that Manager is currently receiving on other Nomad and Transmission Pipeline units in operation with CETA. Of course, past performance is no guarantee of future results, but it is important for investor to know what the underlying revenue assumption is.
>
> “From there, Manager has been advised by CETA that the Transmission units produce approximate 3 times the capacity and revenue of the Nomad units. Manager has not been able to independently confirm this number so there are no assurances these figures will be attained. In fact there may be a variance of 50% or more from these projections.”

67. The OShares 04 Business Plan made detailed false statements under the heading “HOW THE CARBON CAPTURE UNIT REVENUE IS CALCULATED.”

> “The operating agreement with CETA is the source of revenue for the project. In this section we will explain how the baseline revenue is calculated. The baseline revenue is simply the minimum quarterly

revenue we will receive. Ultimately, OS 04 receives a profit share of the excess oil profits the natural gas producer makes as a result of the use of our technology. The minimum baseline is credit against the profit share.

"First, there is a service fee of $20 per barrel of CETASolveTM based on daily usage rates and number of days of operation per quarter.

"Next, the baseline enhanced oil recovery revenue is calculated based on the average daily usage of CETAsolve barrels. The cost of a CETASolveTM barrel is $73.50 and a barrel of saturated CETASolveTM is sold for $96.50 which sets the baseline of the project's percentage of enhanced oil and gas production. Each CO2 saturated CETAsolve barrel for enhanced oil recovery derives a baseline revenue of $23 per barrel.

"Then, every six months the project receives the percentage of enhanced recovery revenue earned above the baseline percentage. For our project, the estimated proforma revenue was based on actual revenue from Freedom Energy Funds 2 CO2NOMAD units and adjusted for the capacity differences.

"There are several factors that will affect revenue. The number of barrels used per quarter will vary. The concentration of CO2 in the gas stream will determine the usage rate of CETAsolve. We will experience set-up and deployment time in our first quarter which will affect revenue. Normally, the equipment is operating an average of 81 days per quarter once the unit has been fully deployed. The saturated CETAsolve can also be recycled more than once in the enhanced oil and gas recovery process which also affect the revenue."

68. The OShares 04 Business Plan repeated the statements about funding partnership with revenues from the CCUs in the "Summary":

"To summarize, the capital raised by OS 04 will purchase a package of Mobile CO2TRANSMISSION Pipeline Units and CO2NOMAD Units and allow participation in an operating agreement managed by CETA.

> "Through the management agreement, OS 04 will share revenue with CETA in a 65%, 50%, 35% split as previously described. After the waterfall split, the revenue will be split 75% for the 82.5 investor shares and 25% to the manager."

69. All of the statements by Shelly, FIC, Hill and the FIC Texas Partnerships in Paragraphs 59-68, above, were not true. There were no revenues from leasing the CCUs and no such revenues would fund distributions to the investors. By falsely stating that the CCUs were producing revenues that funded investor distributions, Shelly, FIC, Hill and the FIC Texas Partnerships offered and sold limited partnership units that were actually a Ponzi scheme.

70. To be truthful, all of the statements from the OShares 04 Business Plan contained in Paragraphs 59-68, above, required the omitted facts that there were no revenues from leasing the CCUs and no such revenues would fund distributions to the investors. In light of the circumstances in which the Business Plan statements were made, these omissions were misleading.

**d. Tax Benefit Representations and Omissions.**

71. In the Business Plans and other offering documents, Shelly, FIC, Hill and the FIC Texas Partnerships referred to tax benefits and how the claimed placement and operation of the CCUs would justify tax benefits. Tax benefits were a significant selling point for the partnership interests.

72. For example, the OShares 04 Business Plan included very specific representations about the tax benefits of an investment and the basis for the tax

benefits. In the same "PARTNERSHIP" section with the equipment chart and Proforma (*see* Paragraphs 59 and 69, above), this statement was made under the Heading "Tax Benefit":

> "There will be a bonus depreciation of the full cost of the equipment in the first year. These benefits will flow to the investor. This should allow for a deduction against ordinary or W-2 income. We recommend that you check with your accountant on this issue. In order for the full deduction to be realized Sponsor will not charge any fees or expenses to OS 04. Those expenses will be borne by the Sponsor through its managing general partner's share. There will be a depletion allowance for the solvent and the oil and gas produced from the enhanced oil recovery process. The depletion allowance will go to the benefit of the Sponsor to offset the startup and management costs of the fund which includes attorney and accounting fees."

73. After the Proforma at the bottom of that page, the OShares 04 Business Plan stated:

> "Note that the average annual return does not include the significant tax benefits that should arise from this investment, specially when the investor personally guarantees the CETA loan. The tax benefit should increase your actual return significantly, but will depend on each investor's personal circumstances."

74. The next section of the OShares 04 Business Plan was titled "REVENUE SHARES, LEVERAGE AND TAX BENEFIT." This section explained that the partnership's business operations will give the partnership a "working interest" that justifies various tax benefits.

75. Under the heading "CETA's Lease/Management Agreement with the Producers," the OShares 04 Business Plan stated:

"There are several pieces to the full operation of the CETAs lease/management agreement. The following describes the lease/management agreement and establishes a working interest in the oil production.

"CETA begins with a master lease/management agreement with the producers who will be utilizing our Carbon Capture Unit. Portions of that lease/management agreement are assigned to OS 04 which establishes OS 04's working interest in all resources from the commencement of placing the Carbon Capture Unit with the Gas and CETASolveTM into operations.

"Because OS 04 owns the solvent all the way through the process, owns the equipment subject to a revenue sharing operating agreement with CETA on profit split, owns an interest in the added production from the wells that their CO2 embedded solvent is injected, and has operating agreements on both ends, and has marketable shale oil product ownership for sale, then a working interest is established.

"These operating agreements give OS 04 and its general partners' liability exposure so that OS 04's transaction with CETA should qualify for both a working interest, equipment write-offs for depreciation, and depletion on the percentage of oil product generated from the wells in which they participate.

"To assist your tax professional, we have provided the following information on how the various provisions in the tax code apply to this project:

"***Law:*** *Section 469(c)(3) exempts 'any working interest in any oil or gas property which the taxpayer holds directly or through an entity which does not limit the liability of the taxpayer with respect to such interest" from being considered a "passive activity." Further, Sec. 469(c)(4) states that the prior sentence "shall be applied without regard to whether or not the taxpayer materially participates in the activity." Additionally, Under Reg § 1.469-1(e)(4)(iv) a working interest in oil or gas property is defined by reference to the depletion rules. These rules cover "minerals in place," including ores of metals, coal, oil, gas, and all other natural metallic and nonmetallic deposit.'* "

76. The "REVENUE SHARES, LEVERAGE AND TAX BENEFIT" section concluded with a "Tax Benefits Summary":

- "Per Manager's tax professional, 100% investment is deductible against ordinary income in year 1
- "there is an annual 15% depletion allowance on the solvent, oil, and gas revenue. This benefit will be allocated to the managing partner's share to offset project expenses."

77. Tax benefits were also part of the "Summary" of the OShares 04 Business Plan:

> "Finally, because of the structure of the lease/management agreement with CETA as operator and the ownership of the equipment and the other means of production, investors of OS 04 will receive substantial tax benefits against ordinary income."

78. All of the statements about tax benefits by Shelly, FIC, Hill and the FIC Texas Partnerships in Paragraphs 71-77, above, were not true. There were no equipment purchases, business operations or revenues to support the promised tax benefits. By falsely stating that equipment purchases, business operations and revenues from the CCUs would justify tax benefits, Shelly, FIC, Hill and the FIC Texas Partnerships offered and sold limited partnership units that were actually a Ponzi scheme.

79. To be truthful, all of the statements from the OShares 04 Business Plan contained in Paragraphs 71-77, above, required the omitted facts that there were no equipment purchases, business operations, or revenues from leasing the CCUs and

there would be no tax benefits from investments in the partnerships. In light of the circumstances in which the Business Plan statements were made, these omissions were misleading.

**e. Misrepresentations and Omissions in the Quarterly Reports and "Fund Scorecards."**

80. Shelly, FIC and the FIC Texas Partnerships distributed quarterly reports to investors. Plaintiffs received quarterly reports that accompanied the quarterly payments to each investor. These false and misleading quarterly reports were called "Fund Scorecards."

81. Plaintiff Goldovsky received a Fund Scorecard along with his quarterly payment from SYN 09, LP for the quarter ended March 31, 2023. It stated an "Equipment In Service Date" of March 31, 2022. The "Fund Cash Flow Summary" reports "Production Revenue Earned from CETA" as $343,759 for the quarter and $905,666 from the fund's inception. The Fund Cash Flow Summary reports a bottom line "Return After Cash Reserve & FIC Profit Share" of $140,500 for the quarter and 281,000 from the fund's inception. The "Fund Balance Sheet Summary" shows equipment valued at $2,810,000.

82. Plaintiffs Frechette, Krupey and Scharf received Fund Scorecards with the payments from OShares 04, LP for the first quarter of 2023. These stated an "Equipment In Service Date" of November 24, 2022. The "Fund Cash Flow Summary" reports "Production Revenue Earned from CETA" as $1,300,384 for the

quarter and "Return After Cash Reserve & FIC Profit Share" of $975,288. The "Fund Balance Sheet Summary" has an equipment value of $16,500,000.

83. These Fund Scorecards were false in at least three respects:

a. Each Fund Scorecard stated, after the name of the partnership, an "Equipment in Service Date." Because no CCUs were actually in service, these "Equipment in Service Dates" were false.

b. The first part of each Fund Scorecard was a table titled "Fund Cash Flow Summary." The first line in this table states a dollar amount for "Production Revenue Earned from CETA" and the last line states a dollar total for "Return After Cash Reserve & FIC Profit Share." Because there was no production revenue, these "Fund Cash Flow Summary" entries were false.

c. The second part of each Fund Scorecard was a table titled "Fund Balance Sheet Summary." The largest amount in the "Assets" section is for "Equipment, Net of Depreciation." Because the partnerships did not actually own this equipment and the CCUs had no value, these asset values were false.

**C. C&N Bank's Involvement in the Ponzi Scheme.**

84. The TSA provides that a person who directly or indirectly, with intent to deceive or defraud or with reckless disregard for the truth or law, materially aids a seller or issuer of a security in violation of the TSA is jointly and severally liable with the seller or issuer, and to the same extent as if it were the seller or issuer. §

4008.055(c)."Reckless disregard" is acting " 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator….In order to perceive such a risk, the alleged aider must possess a 'general awareness that his role was part of an overall activity that is improper.' " *Sterling Trust Co. v. Adderly*, 168 S.W.3d 835, 842 (Tex. 2005).

85. As shown in Paragraph 34, above, C&N Bank materially aided the sales of the unregistered interests in the FIC Texas Partnerships by providing banking services to the FIC Texas Partnerships.

86. Under Texas law, a bank that provides banking services to the promoter of a Ponzi scheme materially aids the violation of the TSA through the Ponzi scheme.

**1. C&N Bank Is Required by Federal Law to Know its Customers and their Banking Behavior.**

87. Federal law requires banks to know their customers and understand their customers' banking behavior. See 31 C.F.R. § 1020.220(a)(1), (2). C&N Bank was and is required to collect information about the holder of each account.

88. C&N Bank must also conduct customer due diligence to gauge the risk of fraud, money laundering, terrorist financing, or other illicit account uses. *See, e.g.*, 31 CFR § 1020.210. C&N Bank is required to understand the types of transactions in which their customers are likely to engage and remain vigilant for transactions that may be suspicious. These laws impose on C&N Bank a duty to understand the nature and purpose of its customer relationships and develop a customer risk profile.

This information must then be used for ongoing monitoring of its customers' transactions.

89. Such duties form part of the federally mandated compliance with Anti-Money-Laundering (AML) laws. Federal regulations, including 12 C.F.R. § 21.21, require C&N Bank to develop, administer and maintain a program to ensure compliance with federal AML laws. The program must be approved by C&N Bank's board of directors and: (1) provide a system of internal controls to ensure compliance at all times, (2) provide for independent testing of the bank's ongoing compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

90. C&N Bank must also implement their customer identification and due diligence programs in a manner that allows it to (i) know who is in charge of each account, (ii) the nature and purpose of the account and the customer's business, and (iii) the anticipated transactions that will be processed through the account, together with expected volume and frequency.

91. The Federal Financial Institutions Examination Council ("FFIEC") sets standards and guidelines for C&N Bank to comply with its AML obligations. The FFIEC BSA/AML Manual includes "Appendix F - Money Laundering and Terrorist Financing Red Flags" (attached to this Complaint as Exhibit 2), which describes certain "red flags" that indicate possible money laundering schemes and other

misconduct requiring further inquiry. Examples of these suspicious indicia relevant to the FIC Texas Partnerships' banking activities include:

a) "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

b) "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

c) "Unusual use of trust funds in business transactions or other financial activity."

d) "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

e) "Goods or services purchased by the business do not match the customer's stated line of business."

f) "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity…."

g) "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

h) "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

i) "Funds transfers contain limited content and lack related party information."

j) "Funds transfers are sent or received from the same person to or from different accounts."

k) "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

l) "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

m) "Purpose of shell company is unknown or unclear."

n) "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

Ex. 2 at pp. 3-5, 11.

92. Documents that Plaintiffs obtained from C&N Bank's response to a subpoena from the SEC show that C&N Bank did perform a level of due diligence as required by the Bank Secrecy Act and the federal Anti-Money Laundering regulations.

**2. C&N Bank Was Aware that Shelly, FIC and the FIC Texas Partnerships Were Selling Unregistered Securities.**

93. C&N Bank had at least a general awareness that the Shelly, FIC, and the FIC Texas Partnerships were selling partnership interests that were not registered. From the time it opened the first of the FIC Texas Partnership bank accounts, the C&N Bank due diligence documents noted that the FIC Texas Partnerships were a type of business that offered and sold unregistered securities. This knowledge meets the Texas Securities Act requirement that C&N Bank materially assisted the Ponzi scheme with reckless disregard for the truth or the law.

### 3. C&N Bank Was Aware that Shelly, FIC and the FIC Texas Partnerships Were Part of a Ponzi Scheme.

94. C&N Bank had at least a general awareness that the Shelly, FIC, and the FIC Texas Partnerships were selling partnership interests that were a Ponzi scheme. C&N Bank knew this from three sources: (a) the pattern of the creation of the FIC Texas Partnerships, (b) the pattern of deposits and withdrawals in the FIC Texas Partnerships' accounts showed no ordinary business activity and only the funding of quarterly payments to investors, and (c) the repetitive pattern of distributions to investors.

#### a. C&N Bank Was Aware of the Pattern of the Creation of the FIC Texas Partnerships.

95. In carrying out its obligation to know its customers, C&N Bank knew when each of the FIC Texas Partnerships was established. C&N Bank knew that FIC was the general partner of each of the partnerships. C&N Bank knew that Shelly and FIC opened a new account for each partnership at or near the time it was established. The pattern of the creation of new investment partnerships by Shelly and FIC showed a pre-conceived plan to raise new investor funds in amounts sufficient to pay promised returns to earlier investors.

96. Shelly and FIC created new limited partnerships around the end of each quarter. This would raise funds to pay promised quarterly returns to prior investors.

97. Shelly and FIC created Freedom Energy Fund, LP, a Texas limited partnership, on December 10, 2019. They created Freedom Energy Fund 2, LP, another Texas limited partnership, on February 11, 2020, prior to the end of the first quarter of 2020. Shelly and FIC then created three Wyoming limited partnerships on August 24, 2020, a month before the end of the third quarter of 2020.

98. Shelly and FIC then began to register Texas limited partnerships in batches. They registered three partnerships on October 27, 2020, and another partnership on November 30, 2020. With the end of the fourth quarter of 2020 approaching, Shelly and FIC registered four partnerships on December 28, 2020. (Exhibit 1 summarizes the creation dates of the FIC Texas Partnerships organized under Texas law.)

99. For the next two years, Shelly and FIC created new partnerships primarily before the end of the next quarter. The following timeline shows the end of each quarter in blue, and the dates new partnerships were created in red:

| Date | Quarter | Partnerships Created |
|---|---|---|
| Mar. 22, 2021 | | 4 Partnerships |
| Mar. 31, 2021 | 1st Quarter | |
| June 1, 2021 | | 1 Partnership |
| June 30, 2021 | 2nd Quarter | |
| July 6, 2021 | | 4 Partnerships |
| Aug. 11, 2021 | | 4 Partnerships |
| Sept. 14, 2021 | | 6 Partnerships |
| Sept. 30, 2021 | 3rd Quarter | |
| Dec. 29, 2021 | | 7 Partnerships |
| Dec. 31, 2021 | 4th Quarter | |

| | | |
|---|---|---|
| Mar. 14, 2022 | | 6 Partnerships |
| Mar. 31, 2022 | 1st Quarter | |
| May 23, 2022 | | 9 Partnerships |
| June 30, 2022 | 2nd Quarter | |
| Aug. 8, 2022 | | 5 Partnerships |
| Sept. 30, 2022 | 3rd Quarter | |
| Dec. 31, 2022 | 4th Quarter | |
| Jan. 13, 2023 | | 2 Partnerships |
| Feb. 7, 2023 | | 6 Partnerships |
| Mar. 31, 2023 | 1st Quarter | |

The timing of the creation of the FIC Texas Partnerships shows that new partnerships were created around the end of each quarter to raise new funds to pay the promised quarterly returns to investors in the earlier partnerships.

**b. C&N Bank Knew that the Pattern of Deposits and Withdrawals in the FIC Texas Partnerships' Accounts Showed No Ordinary Business Activity and Only the Funding of Quarterly Payments to Investors.**

100. C&N Bank knew about the FIC Texas Partnerships' business and the cash flows in and out of the Partnerships' C&N Bank accounts.

101. C&N Bank collected substantial information about each of the FIC Texas Partnerships when it opened their accounts. C&N Bank records for 02 Carbon Capture, L.P. are typical of all of the bank account records for the FIC Texas Partnerships.

102. On the C&N Bank "Business Customer Due Diligence Form" for 02 Carbon Capture, L.P., the Bank reported that the "Purpose of Account" was to "Own

and Operate CO2 Carbon Capture Equipment." The Bank's "Description of Business (detailed)" was "Operating Carbon Capture Equipment for oil revenue."

103. From the 02 Carbon Capture, L.P. Partnership Agreement in its file, C&N Bank knew that the partnership would have "Net Cash Flow" from "revenues, investment income, income from affiliates, and other receipts." (Art. V.C). The partnership would spend money on compensation to the general partner and reimbursing the general partner's expenses, (Art IV.E), operating expenses, and distributions to the limited partner. (Art. V.C).

104. The activity in the C&N Bank accounts for the FIC Partnerships did not show any such normal business revenues or expenditures. The monthly bank statements for 02 Carbon Capture, L.P. showed C&N Bank that (1) new investor funds were immediately wired to a Roy Hill Trust account at Wells Fargo; (2) there was no activity for two or three months; (3) each quarter, CETA wired funds into the account and FIC transferred the same funds—retaining exactly $10,000—to FIC accounts to pay promised quarterly returns; followed by no activity for the next two or three months. There were no deposits or withdrawals consistent with the business operations that C&N Bank's files show that it expected in the accounts. Plaintiffs attach a summary of the bank statements for the 02 Carbon Capture, L.P. C&N Bank account to demonstrate these facts as Exhibit 3 to this Complaint.

105. The monthly bank statements for another FIC Partnership, Syn 01, L.P. showed C&N Bank that (1) new investor funds were immediately wired to a Roy Hill Trust account at Wells Fargo; (2) there was no activity for two or three months; (3) each quarter, CETA wired funds into the account and FIC transferred the same funds to FIC accounts to pay promised quarterly returns; followed by no activity for the next two or three months. There were no deposits or withdrawals consistent with the business operations that C&N Bank's files show that it expected in the accounts. Plaintiffs attach a summary of the bank statements for the SYN 01, L.P. C&N Bank account to demonstrate these facts as Exhibit 4 to this Complaint.

106. The pattern in the foregoing two bank accounts described in Paragraphs 100-105, above, is characteristic of the activity in the C&N Bank accounts for all of the FIC Texas Partnerships. C&N Bank knew that the monthly statements for the FIC Texas Partnerships' bank accounts did not show amounts consistent with expected business operation revenues and expenses. Instead, C&N Bank knew that the partnership bank account activity showed transfers of new investor money immediately out of the accounts followed by a repetitive pattern of supplying each partnership with only enough funds to pay promised quarterly returns, *i.e.*, a Ponzi scheme.

**c. C&N Bank Saw the Repetitive Pattern of Distributions to Investors.**

107. Most of the FIC Texas Partnerships required a minimum investment in round numbers of $50,000, $100,000 or $200,000. Most of the FIC Texas Partnerships promised a 10% quarterly return.

108. Plaintiff Goldovsky invested $500,000.00 in SYN 09, LP. He sent a wire transfer for that amount to an account FIC established for SYN 09, LP at C&N Bank. He received two quarterly payments before the SEC shut down the Ponzi scheme, a $50,000 payment on November 24, 2022 for the "Q3 2022 Distribution" and a $50,000 payment on March 3, 2023 for the "Q4 2022 Distribution." Both of these distributions came from the same account Shelly and FIC established for SYN 09, LP at C&N Bank. Plaintiff Goldovsky thus received distributions for exactly 10% of his original investment. His original investment and the two distributions were in large round dollar amounts.

109. The pattern of Plaintiff Goldovsky's investment and distributions in the C&N Bank account for SYN 09, LP is just one example of the patterns for hundreds of the investors in FIC partnerships, who (a) also received quarterly distributions equal to 10% of their original investments; (b) whose original investments went into C&N Bank accounts established by FIC for each FIC Partnership, and (c) whose distributions came from the same C&N Bank account for their FIC Partnership.

110. Not all FIC Partnerships paid exact 10% quarterly returns. Plaintiffs Frechette, Krupey and Scharf each invested $100,000.00 in OShares 04, LP. Each sent a wire transfer for that amount to an account FIC established for OShares 04, LP at C&N Bank. Each received a "Preferred Return" of $5,910.84 on March 4, 2023. Each of these distributions came from the same account FIC established for OShares 04, LP at C&N Bank.

111. The repetitive pattern of Plaintiffs Frechette's, Krupey's and Scharf's investments and distributions in the C&N Bank account for OShares 04, LP is just one example of repetitive patterns for hundreds of the investors in FIC partnerships. For example, over 30 investors made $100,000.00 investments and received exactly $66,872.28 before the SEC shut down the Ponzi scheme. Eleven investors bought 10 units of an FIC partnership for $100,000.00 per unit and received exactly $65,708.33 per unit before the SEC shut down the Ponzi scheme. These are just a few examples of disparate investors receiving identical sums on the same days from the same FIC Texas Partnership bank accounts at C&N Bank.

112. Based on the foregoing Paragraphs 100-111, C&N Bank knew:

a) Large amounts of cash came into the FIC Texas Partnerships' accounts at C&N Bank shortly after the partnerships were created by Shelly and FIC.

b) All or most of these sums were immediately transferred to a "Roy Hill Trust" in Texas.

c) No amounts consistent with business operation revenues were deposited in the FIC Texas Partnerships' accounts at C&N Bank.

d) No amounts consistent with business operation expenses were withdrawn from the FIC Texas Partnerships' accounts at C&N Bank.

e) New partnerships were created by Shelly and FIC before the end of quarters when investors were promised quarterly returns.

f) Quarterly payments went out of the FIC Texas Partnerships' accounts at C&N Bank, either in round numbers representing 10% of the original inflows, or in repetitive instances where the same amount was paid on the same day to different investors.

C&N Bank had at least a general awareness of the Ponzi scheme. The foregoing facts give rise to a strong inference that C&N Bank perceived the risk that its assistance to Shelly, FIC and the FIC Texas Partnerships would facilitate untruthful or illegal activity.

113. A Ponzi scheme cannot operate without banks to receive and pay out investor funds. The *SEC v. Hill* Defendants could not have carried out their Ponzi scheme without the active assistance of C&N Bank. C&N Bank tracked the account activity of the FIC Partnerships and saw that the accounts were being used to operate a Ponzi scheme. C&N Bank nevertheless accepted hundreds of millions of dollars into the accounts, and then executed transactions through which new and existing investor funds were used to pay earlier investors, with no legitimate underlying business transactions or revenues. Instead of terminating the accounts in response to

these misuses, C&N Bank materially assisted the Ponzi scheme with reckless disregard for the truth or the law.

## VI. CLASS ACTION ALLEGATIONS
## (LR 23.2)

114. This action is properly maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, because "questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiffs allege the following as required by LR 23.2(b).

**"(1) The size (or approximate size) and definition of the alleged class**."

115. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and a class consisting of all other persons and entities who purchased or otherwise acquired interests in any of the FIC Texas Partnerships, from March 27, 2019 through May 31, 2023, inclusive, and who were damaged thereby

116. Excluded from the Class are:

a. the *SEC v. Hill* Defendants;

b. directors and officers of CETA;

c. promoters of the interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC Texas Partnerships, including those persons referred to as "Syndicators" or the "Inner Circle";

d. all entities identified as "Related Parties" on Exhibit 1 to this Complaint;

e. for all entities in sub-parts a-e, above, their officers, directors, managers, managing members, members, subsidiaries, affiliates, employees, agents, successors or assigns;

f. for all natural persons in sub-parts a-f, above, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, and any entity in which they or their immediate families have or had a controlling interest, including their family limited partnerships, family limited liability companies, and

g. any persons or entities who recovered their entire investment and/or made a profit from their purchase or other acquisition of any of the interests sold by the *SEC v. Hill* Defendants, including the interests in the FIC Texas Partnerships.

117. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, the Receiver appointed by the district court in SED v. Hill has filed several reports including lists of persons who invested in the CETA-FIC Ponzi scheme. The Receiver's most recent report listed 566 separate investors in the FIC Texas partnerships. ECF No. 109-5. After excluding the investors described in the preceding Paragraph 116, Plaintiffs believe that there are over 500 members in the proposed Class.

**"(2) The basis upon which the plaintiffs claim (A) To be adequate representatives of the class."**

118. Plaintiffs' claims are typical of the claims of the other putative members of the Class. Plaintiffs and all other putative Class members all purchased interests in FIC Texas Partnerships during the Class Period. These partnership interests were unregistered securities that promised income and tax deductions from the ownership and operation of nonexistent CETA CCUs. Plaintiffs and all other putative Class members assert the same Texas Securities Act claims, based on the sales of unregistered securities, and based on similar false statements and omissions. Plaintiffs and all other putative Class members thus share the same claims, legal theories, and evidence.

119. Plaintiffs are not subject to any unique defenses that would cause them as class representatives to be so preoccupied that the defense becomes the focus of the litigation.

120. Plaintiffs will fairly and adequately protect the interests of the other members of the Class.

121. Plaintiffs have demonstrated their adequacy in their selection and support of their attorneys. Plaintiffs have retained counsel competent and experienced in class actions, complex litigation and the types of claims asserted herein. Their counsel have zealously prosecuted this case on behalf of the Proposed Class, including by: (1) conducting an extensive investigation of the claims prior to

filing the Complaint; (2) engaging in substantial collection of public records and SEC and Receiver investigative materials, and (3) zealously prosecuting the Texas Class Action, *Goldovsky, et al. v. Rauld, et al.*, No. 6:24-CVC-00159-ADA-DTG, in the United States District Court for the Western District of Texas, Waco Division, described in Paragraphs 6 and 18, above.

122. Plaintiffs have also demonstrated their adequacy in their willingness and ability to take an active role in and control the litigation and to protect the interests of absent putative Class members. Plaintiffs have actively prosecuted the Texas Class Action in the interests of the proposed Class, including receiving frequent case status updates from counsel; reviewing and approving drafts of the Complaint before it was filed; participating in discovery, including collecting, reviewing, and producing relevant documents; and payment of more than $65,000 in expenses, including the retention of expert witnesses to assist in the review of their Complaint and available C&N Bank records. Plaintiffs will take an active role in this action against C&N Bank.

123. There are no conflicts of interest between Plaintiffs and the members of the putative Class. Plaintiffs' interests are identical to and directly aligned with the interests of other putative Class members. Each of the claims alleged in the Complaint is based on the same economic injuries caused by the same course of conduct, and Plaintiffs seek to maximize the recovery for the Class.

**"(3) The alleged questions of law and fact claimed to be common to the class."**

124. Among the questions of law and fact common to the Class are:

a. whether the *SEC v. Hill* Defendants and the FIC Texas Partnerships violated the Texas Securities Act by selling unregistered securities to Plaintiffs and the members of the putative class;

b. whether the *SEC v. Hill* Defendants and the FIC Texas Partnerships violated the Texas Securities Act by selling securities to Plaintiffs and the members of the putative class by means of untrue statements and omissions of material fact;

c. whether C&N Bank materially aided the violations of the Texas securities Act by the *SEC v. Hill* Defendants and the FIC Texas Partnerships with reckless disregard for the truth or the law;

d. the extent to which Plaintiffs and the putative members of the Class are entitled to rescission or damages under the Texas Securities Act, and the proper measure of such remedies.

"**(4) In actions claimed to be maintainable as class actions under subdivision (b)(3) of Fed.R.Civ.P.23, allegations thought to support the finding required by that subdivision."**

125. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

126. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. In particular:

a) No members of the putative class have filed any individual actions against C&N Bank making claims similar to the claims asserted herein;

b) Plaintiffs' claims against C&N Bank are similar to the claims against the remaining defendants in the Texas Class Action and will be prosecuted for the same goal of maximizing recovery fort he Class;

c) This District is the most desirable forum for prosecuting the claims of Plaintiffs and the putative Class against C&N Bank after the court in the Texas Class Action granted C&N Bank's motion to dismiss for lack of personal jurisdiction because C&N Bank is subject to general personal jurisdiction in this District;

d) Joinder of all members of the putative Class is impracticable; and

e) There will be no difficulty in the management of this action as a class action.

## VII. CAUSES OF ACTION

### COUNT I
### Violation of § 4008.051 and § 4008.055(c) of the Texas Government Code

127. Plaintiffs repeat, reallege and incorporate by reference each of the foregoing Paragraphs 1- 126 of this Complaint.

128. The *SEC v. Hill* Defendants and FIC Partnerships committed primary violations of Tex. Gov't Code § 4008.051 by selling unregistered interests in the FIC Texas Partnerships. 129. C&N Bank aided and abetted the foregoing primary violations by the *SEC v. Hill* Defendants and the FIC Partnerships. C&N Bank directly or indirectly materially aided the *SEC v. Hill* Defendants and the FIC Partnerships as sellers and issuers of securities, with intent to deceive or defraud or with reckless disregard for the truth or the law.

130. As an aider and abettor, C&N Bank is jointly and severally liable with the sellers and issuers of the securities, and to the same extent as the sellers and issuers.

**COUNT II**
**Violation of § 4008.052 and § 4008.055(c) of the Texas Government Code**

131. Plaintiffs repeat, reallege and incorporate by reference each of the foregoing Paragraphs 1- 126 of this Complaint.

132. The *SEC v. Hill* Defendants and FIC Partnerships committed primary violations of Tex. Gov't Code § 4008.052 by selling interests in the FIC Texas Partnerships by means of untruths and omissions.

133. C&N Bank aided and abetted the foregoing primary violations by the *SEC v. Hill* Defendants and the FIC Partnerships. C&N Bank directly or indirectly materially aided the *SEC v. Hill* Defendants and the FIC Partnerships as sellers and issuers of securities, with intent to deceive or defraud or with reckless disregard for the truth or the law.

134. As an aider and abettor, C&N Bank is jointly and severally liable with the sellers and issuers of the securities, and to the same extent as the sellers and issuers.

**Remedies for Violations of the Texas Securities Act in Counts I and II**

135. Plaintiffs and other members of the Class are entitled to rescission as provided in Tex. Gov't Code § 4008.056.

136. In the alternative, if any members of the Class no longer own the securities, such members of the Class are entitled to damages as provided in Tex. Gov't Code § 4008.057.

137. Plaintiffs and other members of the Class are entitled to costs and attorney's fees as provided in Tex. Gov't Code § 4008.060.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Alex Goldovsky, Glynn Frechette, John Krupey, and Kristin Scharf, individually and on behalf of the Class, request the following relief, and pray that the Court declare this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and that the enter judgment as follows:

A. Awarding Plaintiffs and the other members of the Class rescission as provided in Tex. Gov't Code § 4008.056 and at Texas common law;

B. Awarding Plaintiffs and the other members of the Class actual damages, including damages as provided in Tex. Gov't Code § 4008.057;

D. Awarding Plaintiffs and the other members of the Class prejudgment interest under Texas law, at such rate as the Texas Consumer Credit Commissioner shall determine at the relevant date(s) in the future;

E. Awarding Plaintiffs and the other members of the Class costs and attorney's fees, including those provided in Tex. Gov't Code § 4008.060 and the Federal Rules of Civil Procedure, as applicable;

F. Awarding Plaintiffs and the other members of the Class interest on the final judgment as provided by 28 U.S.C. § 1961; and

G. Awarding Plaintiffs and the other members of the Class such other relief as this Court deems appropriate.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 23, 2025

Respectfully submitted,

*/s/Jeffrey J. Goldin*

Jeffrey J. Goldin, Esquire
GOLDIN LAW GROUP, P.C.
Identification No.: 312689
135 Old York Road
Jenkintown, PA 19046
Tel: (215) 261-7505
Fax: (267) 865-6930
Email: jgoldin@glgphilly.com

*/s/Patrick Zummo*
Patrick Zummo
*Pro Hac Vice forthcoming*
Texas Bar No. 22293450
Lisa Gerling Zummo
*Pro Hac Vice forthcoming*
Texas Bar No. 07818500
LAW OFFICES OF PATRICK ZUMMO
950 Echo Lane, Suite 333
Houston, Texas 77024
(713) 651-0590 (Telephone)
pzummo@zoomlaw.com
lzummo@zoomlaw.com

*Attorneys for Plaintiffs*
*and the Proposed Class*